[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from a decision of the defendant denying the three applications filed by the plaintiffs to: 1) amend the town of Monroe's zoning regulations by adding a new "Design Housing Opportunity (DHO) district," 2) to rezone the approximate 24 acres involved in the plaintiffs' proposal to the DHO district, and 3) site plan approval of the plaintiffs' proposed 31 unit residential development (referred to as "Castle Wood").
The court finds that DelMar Associates, Inc. is, and at all times relevant to this appeal, has been a Connecticut corporation, the principals of which are Mario DelVecchio, Jr., and Michael Infante.
DelMar Associates, Inc. and its principals own adjacent parcels, totaling 23.8 acres, located at 89 and 105 West Maiden Lane in Monroe, as set forth in two Deeds, both dated June 18, 1998 and recorded in the Monroe Lane Records at Volume 798, Page 13 and Volume 798, page 15.
The parties stipulated that the plaintiffs have owned the subject property since June 18, 1998 to February 22, 2002, the date of the Stipulation, without interruption or conveyance of any portion of or rights in the subject property to a third party and the Court makes finding in accordance with that stipulation.
The Court finds that the plaintiffs are aggrieved by the action of the defendant in denying its three applications.
Less than one percent of Monroe's existing housing units qualify as affordable housing, placing Monroe 157th of Connecticut's 169 towns.
On September 22, 2000, the plaintiff DelMar Associates, Inc., filed the three-applications in issue with the defendant Commission. The Castle Wood project was an affordable housing application development pursuant CT Page 8242 to the requirements of Conn. Gen. Stat. § 8-30 in effect at the time the application was filed on September 22, 2000. On March 15, 2001, the defendant Commission denied all three applications pursuant to the following four actions:
1) the adoption of "Findings of Fact" identified as Motion No. 1;
2) the rejection of "Zoning Regulation Text Amendments" identified as Motion No. 2;
3) the rejection of "Rezoning Proposal" identified as Motion No. 3; and
4) the rejection of "Site Development Plan" identified as Motion No. 4.
Motion No. 1, the Findings of Fact was pertinent to all petitions and applications of DelMar Associates, Inc., regarding its property at 89 and 105 West Maiden Lane. The Findings of Fact were as follows:
1. Aquifer and Stream Protection
 a. Pages 30-32 of the Monroe 2000 Plan of Conservation and Development focus on water quality issues. At page 30, the Plan states, "Water quality is the most important natural resource in Monroe. Many residents rely on groundwater from private wells and public water supply sources in Monroe include watersheds for reservoirs of the Bridgeport Hydraulic Company and areas of high groundwater availability (aquifers)." Page 31 contains a program goal entitled "Protect Important Water Resources," which states, "Water resources are the principal elements in any effort to maintain an ecological balance because of the essential role and function they play in maintaining and improving water quality, maintaining the water table, providing extraordinary scenic value, supporting wildlife, and controlling drainage and flooding. Water resources in Monroe include surface water features (such as rivers, streams, lakes, ponds, wetlands, swamps, marsh areas, vernal pools, floodplains) and groundwater features (such as aquifers)." A similar statement is set forth on page 34.
b. The Town's remaining two-acre and three-acre residential zones are located primarily along the Town's major watercourses (Pequonnuck River, Mill River, Boys Halfway River, Hurds Brook, Means Brook). The lower densities in these areas will help minimize the creation of additional stormwater runoff and septic leachate for purposes of both surface water and groundwater protection, while still allowing reasonable use of the land. The Town Planner has noted that the CT Page 8243 three-acre zone serves several purposes, including reducing the area of impermeable surface and, thereby, reducing the amount of direct drainage discharge to the area and returning more (and cleaner) surface water to the groundwater system.
 c. The site under consideration is notable for its steep slopes and rocky, shallow soils. As indicated by the Town Planner, the proposed intensive development of the site would require a much higher degree of land grading and reshaping (including excavation and blasting) than development under the current three-acre zoning. The Commission finds that such intensive activity is unsuitable for a site so near to a significant watercourse and its sensitive, riparian surroundings. Development consistent with the current zoning would much better protect the river and its associated wetlands, wildlife and habitat.
 d. The land areas around the watercourses are underlain by deep, coarse-grained stratified drift aquifers. Those types of aquifers have been identified by the Connecticut Department of Environmental Protection and the U.S. Geological Survey as having the greatest potential to serve as public water-supply sources in the future.
 e. The failure of a large, community subsurface sewage disposal system is much more likely to cause substantial harm to groundwater and surface water resources than the failure of individual, single-family septic systems located in the same area.
 f. Constant attention and vigilance is necessary to protect the Town's water quality and potential future groundwater resources. Although the Commission recognizes the desirability of increasing the Town's stock of affordable housing, it also finds that that goal is outweighed on the site presently under consideration by the possibility of permanent water-quality degradation caused by siting an especially intensive development in one of Monroe's most environmentally sensitive areas. The Commission notes that the "affordable" status of the units would not need to be maintained after 30 years, whereas the need to provide adequate, clean water will remain and continue to grow. There are numerous opportunities for creating affordable housing in other zoning districts within the Town, where the impact on water quality may not create such a high level of concern.
g. The present application, with its dense development clusters and concentrated septic discharges, is inconsistent with the Plan of Conservation and Development and the need to protect one of the most sensitive water and environmental resource areas within the Town of Monroe. CT Page 8244
2. Wastewater Disposal
 a. Information provided by one of the Commission's consultants, Nathan L. Jacobson Associates, Inc., indicates "that the plans for wastewater collection, treatment and disposal facilities are in the preliminary planning stages at this time, and that the proposal is not to be viewed as a final design." (Jacobson letter of December 6, 2000 at p. 2). Among the tasks needed to provide assurance that the proposed system could successfully handle the wastewater from the proposed 93 bedrooms are "additional deep test pits, laboratory soils tests and groundwater monitoring through the wet period of the year." Id. The applicants propose to complete these requirements "after the major planning issues are resolved." Id.
 b. Page 5 of the Jacobson report states, "When dealing with potentially shallow to bedrock soils, subsurface conditions can change rapidly which warrants a large number of test pit excavations to provide a high degree of certainty that the proposed subsurface sewage disposal system areas will have sufficient depths of soil above bedrock." Page 7 states, "It must be demonstrated in greater detail that sufficient soil hydraulic capacity exists to accommodate both the wastewater flows, plus the stormwater recharge flow." It further questions "the fate of nitrogen concentrations in the groundwater during an extended dry period when there will be little or no stormwater recharge, such as the period of low rainfall amounts that occurred during the summer of 2000." Excess nitrogen in drinking water is a recognized source of health problems. As noted above, the area underlying the site is a potentially high-yielding aquifer.
 c. Page 8 of the Jacobson report notes that the proposed community septic system would require financial oversight by the Monroe Water Pollution Control Authority. The applicant acknowledged on January 11 that it had never discussed this matter with the WPCA. The Commission believes that appropriate financial oversight of such a system would be essential to protect and preserve the health and safety of future residents, including those who would occupy the "affordable housing" units.
d. For the foregoing reasons, the Commission concludes that the applicant's seeking approval of its development plans at this time is premature. The Commission believes that it is inappropriate to seek approval of a conceptual site plan for a project containing 93 bedrooms before the applicant has demonstrated the actual ability of the site to accommodate all of the wastewater and has made appropriate arrangements with the WPCA for financial controls. If the additional testing, which even the applicant has agreed would be needed, shows that the site CT Page 8245 cannot accommodate the proposed wastewater discharges, the Commission would be obliged to review a different site plan and the proceedings on the present plan would have been for naught. The Commission believes that the actual capacity of the soils to absorb wastewater discharges should be resolved before site arrangement issues are addressed. Since the applicant would have had to perform these tests regardless of the Commission's action on the pending application, the postponement of a decision until receipt of more conclusive data will not have any impact on the creation of affordable housing.
3. Community Character
 a. Pages 21-24 of the Monroe 2000 Plan of Conservation and Development focus on "Community Character." At page 21, the Plan states that "community character is an important issue to Monroe residents" and that "40 percent of the residents surveyed moved to Monroe because of the small town atmosphere and the fact that it was a beautiful town." "In surveys and meetings for the Plan, residents consistently indicated that the Town should continue to be concerned about the issue of community character and protecting those characteristics that make Monroe a special place to live." One of the eight aspects of community character mentioned as particularly worthy of preservation on page 22 is "agricultural and rural features." The Commission believes that the prospective residents of "affordable housing" units would be no less interested in maintaining the character of the community as other residents.
 b. Land within Monroe's three-acre residential zoning districts cumulatively represents a relatively small percentage of the residential land within the Town. Three-acre lots create a rural residential character that is substantially different from the character of densely clustered housing, even where the clusters are offset by large areas of open space. Simply put, high density cluster housing (that is, housing densities that exceed the overall density that would be permitted by the underlying zoning district on a particular site) does not create or maintain a rural character. The rural character of the three-acre residential zoning districts is an important part of the blend that comprises the overall character of the Town. Once a portion of a three-acre zoning district is lost to densely clustered housing, the loss is permanent and, effectively, cannot be replaced. Given the modest percentage of land in Monroe that is devoted to larger-lot zoning, the loss of even a few acres to cluster housing would permanently harm the rural character of that area.
c. Although the applicants and their appraiser opined that the proposed project would not change the character of the area because CT Page 8246 some of the surrounding residences are on small lots, the Commission disagrees. The nearby residents now occupy homes that are bordered by land of rural character. If the proposed development were approved as proposed, that aspect of their surroundings would be changed. If the Commission were to adopt the philosophy that zoning districts can be modified without harm simply because they abut zoning districts of a different character, then the entire RE zoning district could ultimately be lost to "creeping amendment." The preservation of a reasonably large RE zoning district is an important consideration that outweighs the need for affordable housing at this particular site.
 d. Several of the proposed units would be placed very close to neighboring, single-family residences. The owners of some of those properties have expressed concern about their privacy, the potential for noise and other impacts, and the loss of their reasonable expectations for the character of their community. Although the applicant's plans could possibly be modified to reduce such impacts and concerns, as by moving certain units, providing buffering, or reducing the number of units, the impacts could not be completely eliminated, given the location of the developable land on the parcel. In addition, the Commission has not been provided with sufficient information by the applicant to determine how a reduction of units would affect the financial viability of the project.
4. Blasting
 The Commission finds that it was not provided with adequate information as to the extent and potential impact of blasting, particularly given the extent of ledge and the proximity of existing homes on adjacent properties.
5. Open Space
 The proposed combination of open space dedication and conservation easement does not adequately conform to the open space preservation strategies set forth in the 2000 Plan of Conservation and Development, with special reference to pages 41 and 42 (continuous trail systems). Additional open space should be dedicated to provide opportunities for continuous trail development.
The motion was approved by a vote of S to nothing.
Motion No. 2, the Rejection of Text Amendment was denied based upon the findings of the defendant Commission applicable to all of the applicants' petitions and applications and for the following additional reasons: CT Page 8247
1. At Tab 1, Exhibit A, Page 2 of its submission dated September 22, 2000, the applicant expressly states:
 The amendment has been drafted to apply exclusively to CastleWood development. The Commission may, in its discretion, expand this language after adoption to facilitate future affordable housing developments.
The applicant's attorney confirmed, in his oral remarks during the public hearing, that the proposal was crafted in such a way as to fit the specific physical characteristics of the parcel located at 89 and 105 Maiden Lane, on which the applicant has proposed an affordable housing development.
The Commission finds that the site currently under consideration is not suitable for the intended project. Consequently, it would be inappropriate to adopt regulations that are specifically designed to allow such a project on that site.
2. As the applicant's attorney noted, the courts in Connecticut have held that an applicant need not comply with existing zoning regulations when seeking approval of a proposal for an affordable housing development. Consequently, the amendment is unnecessary to increase the stock of affordable housing within the Town of Monroe.
3. Since the amendment was expressly intended to be site-specific, it does not improve or foster the comprehensive plan, but is, instead, similar to spot zoning. The Commission finds that it is inappropriate, and inconsistent with the concept of a comprehensive plan, to adopt zoning regulations that have no practical effect and are intended to relate to specific development projects, rather than an overall zoning design.
4. At Tab 1, Exhibit A, Page 2 of its submission dated September 22, 2000, the applicant notes that the existing Zoning Regulations already contain provisions that are very similar to those proposed in the amendment, except that the amendment refers specifically to the statutory criteria for affordable housing under Conn. Gen. Stat. § 8-30g. Thus, the existing regulations already provide a significant opportunity for the development of affordable housing in Monroe.
That motion was approved by a vote of 5 to nothing.
Motion No. 3 was the rejection of the "Rezoning Proposal" and was denied based upon the following: CT Page 8248
1. The findings of the Commission applicable to all of the applicant's petitions and applications.
2. The reason set forth in the Commission's denial of the applicant's petition to amend the zoning regulations.
3. The fact that no such zoning district has been established in Monroe.
That motion was approved by a vote of 5 to nothing.
Motion No. 4 was the rejection of the "Site Development Plan". The Site Development Plan was denied based upon the findings of the Commission applicable to all of the applicant's petitions and applications by a vote of 5 to nothing.
I. The Standard of Review.
As a result of P.A. 00-206, there are two standards of judicial review under § 8-30 (c)(1)(A) through (D).
Under § 8-30g (c)(1)(A), the court must determine, as prior to the enactment of P.A. 00-206, § 1(g), whether the commission has shown that its decision is supported by "sufficient evidence" in the record. Under subparagraphs (B), (C) and (D) of the statute, however, the court must review the commission's decision independently, based upon its own scrupulous examination of the record. Therefore, the proper scope of review regarding whether the commission has sustained its burden of proof, namely that its decision is based upon the protection of some substantial public interest; the public interest clearly outweighs the need for affordable housing; and there are no modifications that reasonably can be made to the application that would permit the application to be granted — requires the court, not to ascertain whether the commission's decision is supported by sufficient evidence, but to conduct a plenary review of the record in order to make an independent determination on this issue.
I. THE ISSUE OF WHETHER THE COMMISSION HAS SHOWN THAT ITS DECISION IS SUPPORTED By "SUFFICIENT EVIDENCE" IN THE RECORD.
In discussing the standard of "sufficient evidence" in the record, the court in Kaufman v. Zoning Commission, 232 Conn. 122 (1995) stated in part at page 156 as follows:
We agree with the commission that a zoning authority, acting in its legislative capacity, is not limited to CT Page 8249 considering only the effects of its actions that are definite or more likely than not. Connecticut Resources Recovery Authority v. Planning Zoning Commission, 225 Conn. 731, 756, 626 A.2d 705 (1993) (holding that commission reasonably could reject zoning amendment because of "risks" of environmental degradation); se also Huck v. Inland Wetlands Watercourses Agency, supra, 203 Conn. 549 (upholding agency decision to deny wetland permit because, inter alia, "the record does contain evidence that there could be pollution" [emphasis added]). We disagree, however, that the commission was entitled to reject this plaintiff's application based on the mere possibility that the zone change would harm the Lake Kenosia watershed. As we explained above, the commission was required to show a reasonable basis in the record for concluding that its decision was necessary to protect substantial public interests. The record, therefore. must contain evidence concerning the potential harm that would result if the zone were changed from RA-40 to RA-8 and concerning the probability that such harm in fact would occur. (Emphasis provided.)
This court will address the four motions adopted by the Commission and its reasons therefore seriatim.
A. Findings of Fact
I. Aquifer and Stream Protection
The Commission stated reasons a through g regarding the issue of aquifer and stream protection. These reasons will be addressed seriatim.
Aquifer and Stream Protection Reason A
The court finds that the protection of groundwater, water quality, maintaining the water table, supporting wildlife and controlling drainage and flooding are public interests that should be protected. This court also finds, however, from a scrupulous examination of the record that there is no reasonable basis in the record for concluding that its decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicant's proposals and concerning the probability that such harm in fact would occur. CT Page 8250
This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would reasonably permit the applications to be granted regarding these public interests.
Aquifer and stream protection reason b.
The defendant commission makes the following argument in support of reason b regarding aquifer and stream protection:
 The Town Planner, Daniel Tuba, explained, in a memorandum to the Commission (ROR Exhibit 50), the dangers of the plaintiffs' high intensity, high density proposal. According to the Town Planner, Munroe has carefully designated those areas around the Town's major watercourses as two-acre or three-acre zones. It has done so to minimize impermeable surfaces which cause increased storm water runoff and result in less water returning to the groundwater system. In addition, such zoning reduces the amount of septic system leachate that discharges to the Town's water resources. High intensity, high density uses such as the plaintiffs' proposed development result in a much higher total area of impermeable surface, and a much higher quantity of septic system leachate being discharged to the Town's water resources than would be the case if land such as the Site were to be developed under the existing three acre zoning requirements. In addition, high intensity, high density uses result in greater impacts to water resources by pollutants, generally.
The court finds that the protections from additional storm water runoff and septic leachate for purposes of both surface water and groundwater protection and reducing the impact of pollutants to the river and wetlands environment as well as reducing the amount of direct drainage discharge to the area and returning more (and clearer) surface water to the groundwater system are public interests that should be protected. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This proposal has already obtained conditional approval from the Town of Monroe Conservation and Water Resources Commission/Inland Wetland Commission on January 25, 2001. The findings of that Commission were as follows: CT Page 8251
FINDINGS:
 The Commission reviewed the application and determined that the proposed activities related to the development will not have a significant environmental impact on the regulated areas. The Commission held a public hearing after receiving a petition signed by 25 persons.
 The plan as presented will not involve an adverse effect on the regulated area. The plan submitted with the application does not provide for any activity within a regulated area. The proposed storm water basin may result in discharge to the regulated watercourse setback. The approved alternative plan, as presented by the applicant at the public hearing, will reroute the discharge to a recharge trench. The proposal as approved will not involve activities within a regulated area.
 The Commission finds that a feasible or prudent alternative to the applicant's proposed development as modified by this approval does not exist.
MODIFICATIONS AND CONDITIONS:
 1. The applicant shall include on the final plans that an inspection of the recharge trench by a Licensed professional Engineer will be required during construction of the recharge trench and prior to the discharge of storm water to the trench.
 2. There shall be a double row of silt fence installed in the proposed silt fence location down-gradient of the septic system.
 3. The proposed recharge trench shall be installed prior to the discharge of storm water form the storm water drainage system in order to provide sediment control. The design engineer shall inspect the trench prior to final site stabilization to determine the need for sediment removal.
STANDARD CONDITIONS:
 1. Regulated activities herein shall be implemented by the permittee in accordance with the timing, location, duration and intent proposed and approved by the Commission.
2. Notice of assignment or transfer of the permit must be given to the Commission immediately. Failure to do so may invalidate your permit. CT Page 8252
 3. Install sediment and erosion controls prior to soil disturbance and maintain them during construction and remove them prior to requesting final inspection.
 4. The posting of a cash or passbook savings account may be required at any time during construction by the Inland wetlands Commission for erosion controls or any required wetland mitigation measures, in an amount to be determined by the Commission or its agent.
 5. In the event an appeal is taken from this decision the applicant shall provide the Commission with three (3) sets of all plans, reports and documents in support of the application within thirty (30) days.
6. Heating oil tanks will not be buried anywhere on the property.
___________________________________________________________
 PERMIT APPROVED: January 10, 2001. All appropriate conditions must be satisfied prior to site disturbance. THIS APPROVAL IS NOT AN AUTHORIZATION TO START CONSTRUCTION.
 PERMIT EXPIRES: January 10, 2006 Permit duration is five (5) years. Additional extension must be requested prior to expiration.
 THIS PERMIT IS NOT TRANSFERABLE UNLESS THE NEW OWNER PROVIDES THE COMMISSION WITH A SIGNED ACKNOWLEDGMENT THAT HE UNDERSTANDS AND ACCEPTS THE CONDITIONS OF APPROVAL.
 This application is approved with the above conditions and or modifications. This decision and these conditions are consistent with the purposes of the wetland regulations which area designed to protect the citizens of Monroe by providing a balance between the need for growth, development and enjoyment of the Town's natural resources with the need to protect its environment and ecological stability.
This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicant's proposals and the probability that such harm in fact would occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests. CT Page 8253
Aquifer and stream protection reason c.
The court finds that the protection of water courses and its sensitive, riparian surroundings, as well as the protection of the river and its associated wetlands, wildlife and habitat are public interests that should be protected. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court finds that there is no reasonable basis in the record for concluding that the higher degree of land grading and reshaping (including excavation and blasting), than development under the current three-acre zoning, would have any adverse effect on watercourses and its sensitive riparian surroundings as well as on the river and its associated wetlands, wildlife and habitat. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm in fact would occur. This court further finds that there is not sufficient evidence in the record that those public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Aquifer and stream protection reason d
The court finds that the protection of aquifers that have the greatest potential to serve as public water supply sources in the future are public interests that should be protected. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Aquifer and stream protection reason e
The court finds that the protection of groundwater and subsurface water resources are public interests that should be protected. The Commission makes the following argument in support of reason e regarding aquifer and CT Page 8254 stream protection:
 "An important factor in the Commission's decision was the size of the plaintiffs' proposed community septic system.
 Leaving aside, for the moment, the fact that the system design was incomplete and preliminary, the commission recognized that such systems have much higher potential for harm than smaller, individual septic systems associated with three-acre zoning. (ROR Exhibit 50) The size of the proposed septic system raised the issue of the long-term consequences of such a system were it to fail. Such a failure would have severe potential repercussions on the Pequonnuck River and the underlying aquifer. Again, the reason the Town had designated the area of the Site as a three-acre zone was to preserve and protect an area of high groundwater availability, and to prevent even the possibility that groundwater quality would be jeopardized. The plaintiffs, in essence, were asking the Commission to gamble with Monroe's future water supply and natural resources, and the Commission was unwilling to risk the public health and welfare of Monroe's current and future residents."
The court is not persuaded by that argument. The court makes the following finding of facts regarding this issue. Any system exceeding 5,000 gallons a day is required to be permitted by the State Department of Environmental Protection. The design flow for the proposed project is 13, 950 gallons a day for the total number of bedrooms. A second reason that a DEP permit is required is that the proposed systems are categorized as a community septic system because they are separate residential structures tied to a common system. The required Department of Environmental Protection State Capitol Discharge Permit requires regular inspection, monitoring and reporting of the system, operation, maintenance and condition to the State. The design criteria includes the use of conservative design flows for the design of the leach field systems and the site capacity, that the soils on the site have adequate hydraulic capacity, which is a key element on any system similar to this, that you can get that much water into the natural soils and allow it to flow away from the leach field areas without breakout, that the leach fields are sized on a stable, long-term application rate, in that the pollutants associated with the wastewater would be renovated before the effluent flowing through the groundwater reaches any down gradient property line, surface water, or water supply well or wetland. The Department of Environmental Protection State Discharge permit requires engineering inspection through construction, as well as certification of the installed system to insure that the constructed facilities conform with the approved plans and specifications. There is a factor of safety in the design flow for the system in that on the average you use 50 gallons per day per person per household and the system is designed for CT Page 8255 75 gallons per day per person per household. The system is further designed on the assumption that there are two people in every bedroom which involves a further conservative design, as you usually do not have two persons in every bedroom in a dwelling. The DEP requirement is that there is a 50% reserve area built-in to the system in design, which has been done in this design. There is also room to expand the system, both horizontally and vertically. The system is monitored through the use of monitoring tubes at the end of each trench with a cap on it, and quarterly measurements are taken to measure the depth of what is called the pondet effluent. Further, a contract is entered into with a subsidiary of the Bridgeport Hydraulic Company to look at the actual water usage. If the actual water usage exceeds the amount allowed by the Department of Environmental Protection, then the Department of Environmental Protection is notified that the applicant is over the permit requirements and the applicant will have to make the corrections required by DEP. DEP requires that the Association retain an engineer to monitor the development. The monitoring is done on a quarterly basis for so long as the permit is in place, which could be forever. The river is approximately 250 feet from this site and there is no risk to the public health from this development. It is unfathomable that the effluent would get to the river. The Department of Environmental Protection does not want to spend a whole lot of time on this type of proposal until the applicant has received planning and zoning permission. It is the opinion of DEP that this site is feasible to dispose of the wastewater in question and the court so finds. The position of the Department of Environmental Protection is that if the applicants obtain approval from the Planning and Zoning Commission, then the construction documents will have to be fine-tuned based upon further testing to be done at the site. While DEP is of the opinion that the site is feasible, DEP will require further testing, which is not unusual.
This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicant's proposals and concerning the probability that such harm, in fact, would occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Aquifer and stream protection reason f
CT Page 8256
The court finds that the need to protect sensitive water and environmental resource areas within the Town are public interests that should be protected. The court finds that the protection of water quality and potential future groundwater resources are public interests that should be protected. The defendant commission while recognizing the desirability of increasing the town's stock of affordable housing found that the goal to increase affordable housing is outweighed on the site presently under consideration by the possibility of permanent water quality degradation caused by siting and especially intensive development in one of Monroe's most environmental sensitive areas. As stated inKaufman v. Zoning Commission, 232 Conn. 122, 156 (1995):
 We disagree, however, that the Commission was entitled to reject this plaintiff's application based on the mere possibility that the zone change would harm the Lake Kenosia watershed. As we explained above, the Commission was required to show a reasonable basis in the record for concluding that its decision was necessary to protect substantial public interest. The record, therefore, must contain evidence concerning the potential harm that would result if the zone were changed from PA-40 to PA-S and concerning the probability that such harm in fact would occur.
This court finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicant's proposals and concerning the probability that such harm in fact would occur. The record only contains evidence that there is a possibility of permanent water quality degradation. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests. The defendant argues in part in its brief that:
In addition, the only modifications that would mitigate the Commission's bases for its decision would be to substantially reduce the size and scope of the proposed development so that it's impact more closely approximated those associated with three-acre zoning. Given that the plaintiffs' did not propose any reduction in the size and scope of their proposed development in response to the Commission's concerns, such a reduction would likely be perceived by the plaintiffs as unreasonable. CT Page 8257
This court also finds that the modifications proposed would not be reasonable. This is a 24-acre tract and modifications to reduce the size and scope to more closely approximate those associated with three-acre zoning would result in 8 units being developed instead of the proposal to develop 31 residential units. This court concludes that such a reduction is not reasonable.
Aquifer and stream protection reason g
The court finds that the protection of aquifers that have the greatest potential to serve as public water supply sources in the future are public interests that should be protected. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
II Wastewater disposal
The Commission has stated reasons a through d regarding the issue of wastewater disposal. These reasons will be addressed seriatim.
Wastewater disposal reason a.
The court finds that. there is a need for additional deep test pits, laboratory soil tests and groundwater monitoring through the wet period of the year and that those are public interests that should be protected. The court does find, however, that those interests can be fully protected by requiring the applicant to meet all of the requirements of DEP as part of this proposed application. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record CT Page 8258 that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Wastewater disposal reason b.
The court finds that the need for further detail to show that sufficient soil hydraulic capacity exists to accommodate both the wastewater flows plus the storm water recharge flow and the nitrogen concentrations in the ground water during an extended dry period are all public interests that should be protected. The court does find, however, that those interests can be fully protected by requiring the applicant to meet all of the requirements of DEP as part of this proposed application. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Wastewater disposal reason c.
This court finds that the financial oversight required by the Monroe Water Pollution Control Authority is a public interest that should be protected. The Town's Water Pollution Control Authority has to be satisfied with the management structure and financial arrangements that are set up to operate and maintain the system. The Water Pollution Control Authority of the town of Monroe would require that a bond be posted that would be held by the Water Pollution Control Authority. The condominium association has to setup a sinking fund, in which part of their monthly dues goes into this sinking fund. The number is monitored by the Public Works Department. The Town is named on the account and if something does go wrong, the Town would have the ability to go in and tap the funds and repair the system, which is why the quarterly monitoring report also goes to the Town. The bonding for the system is based on a 30-year design which is amortized based on the number of units and that determines the yearly, or monthly charges that people have to pay. The Town Water Pollution Control Authority would require that the owner of the facility, which in this case would probably be an association ownership, would have to set aside cash reserves for operation and CT Page 8259 maintenance of the system, contingency funds for any kind of emergency repair, and typically requires that capital reserves are established for building up accounts for long-term replacement of system components as they reach the end of their useful life. This court also finds, however, that that protection can be fully met by requiring the applicants to obtain the necessary approval from the Monroe Water Pollution Control Authority. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Wastewater disposal reason d.
This court finds that the need to have final site plan design is a public interest that should be protected. The court does find, however, that those interests can be fully protected by requiring the applicant to meet all of the requirements of DEP as part of this proposed application. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
III Community Character
The Commission stated reasons a through d regarding the issue of community character. These reasons will be discussed seriatim.
This court also had the benefit of viewing the site and the surrounding area with the consent and in the presence of both counsel. This court finds that the proposal by the applicant is not out of character with the CT Page 8260 surrounding area.
Community character reason a.
The court finds that the protection of community character is a public interest that should be protected. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Community character reason b.
This court finds that the protection of community character is a public interest that should be protected. This court, however, finds that the loss of this parcel of land would not permanently harm the rural character of the area that it is located in. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Community character reason c.
This court finds that the protection of community character is a public interest that should be protected. This court also finds that the proposed project would not change the character of the area. All of the surrounding homes are located in a one-acre zone. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court CT Page 8261 concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
Community character reason d.
This court finds that the protection of privacy, the potential for noise and other impacts and the loss of reasonable expectation for the character of a community are public interests that should be protected. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
IV Blasting
This court finds that the need for the defendant commission to be provided with adequate information regarding blasting is a public interest that should be protected. This court further finds that there is no credible evidence in the record that there would be an adverse impact from blasting. The court further finds that the Commission was provided with adequate information regarding blasting. Blasting contractors must follow state and local rules for excavation and must show proof of bonding prior to beginning work. The Commission was presented with evidence regarding a monitoring plan that contained preventative measures together with vibration monitoring, photographs of potentially affected structures prior to blasting and on-site inspection of adjacent homes.
This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence CT Page 8262 concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
V Open Space
This court finds that the need to have adequate open space is a public interest that should be protected. In excess of 11 of the approximate 23 acres in the applicant's proposal are to be protected by a conservation easement in favor of the Town of Monroe. DEP may require that the donated land be in the ownership of the Association or the ownership of the Town of Monroe. The plan of development for the Town of Monroe recognizes that conservation easements, while not as desirable as outright donations of property, do constitute an acceptable means of protecting the designated areas. The applicant would be willing to make an outright donation of the land in question, if such a donation as opposed to a conservation easement would be approved by DEP. This court also finds, however, from a scrupulous examination of the record, that there is no reasonable basis in the record for concluding that the decision is necessary to protect those substantial public interests. This court concludes that the record does not contain evidence concerning the potential harm that could result from the applicants' proposals and concerning the probability that such harm would in fact occur. This court further finds that there is not sufficient evidence in the record that these public interests clearly outweigh the need for affordable housing. This court also finds that there is not sufficient evidence in the record that there are no modifications that reasonably can be made to the applications that would permit the applications to be granted regarding these public interests.
B. REJECTION OF TEXT AMENDMENT
The rejection of the text amendment to the Monroe Zoning Regulations for a new "Design Housing Opportunity (DHO) district" was denied based upon the findings of the Commission applicable to all of the applicant's petitions and applications and for four additional stated reasons. Those four additional stated reasons will be discussed seriatim:
Rejection of text amendment reason 1.
This court finds that the site under consideration is suitable for the intended project. There is no credible evidence in the record that the CT Page 8263 site is not suitable for the intended project.
Rejection of text amendment reason 2.
The reason stated by the Commission would indicate that the Commission would prefer that an applicant ignore all zoning regulations in seeking affordable housing approval. At best, this is a spurious reason. Considering the percentage of affordable housing development in the Town of Monroe, it is obvious that there is a need to increase the stock of affordable housing.
Rejection of text amendment reason 3.
Once again, the Commission would have the court believe that it would rather have an amendment to the zoning regulations that would allow affordable housing projects to be permitted anywhere in the Town of Monroe. The court finds that reason 3, at best, is spurious.
Rejection of text amendment reason 4.
The Commission here argues that existing regulations already provide a significant opportunity for the development of affordable housing in Monroe. The commission points to no evidence in the record as to why less than one percent of its existing housing units qualify as affordable housing, placing the Town of Monroe 157th of the Connecticut's 169 towns. It is obvious that the existing regulations do not provide a significant opportunity for the development of affordable housing in Monroe.
The court finds that the rejection of the text amendment has no basis in fact.
A primary distinction between the existing zoning regulations for the Town of Monroe under Designed Resident's District Article X, Section 117-1003(B), is that the existing zoning regulations require a minimum parcel size of 70 acres. It is obvious that that minimum parcel size is going to restrict the number of parcels that will qualify under the existing zoning regulations.
C. REJECTION OF RE-ZONING PROPOSAL.
The rejection of the re-zoning of the applicant's land to the Design Housing Opportunity (DHO) district was based on three reasons. Those reasons will be discussed seriatim:
Rejection of re-zoning proposal reasons 1 and 2. CT Page 8264
This court has already addressed the findings of the Commission applicable to all of the applicant's petitions and applications and its reasons for the denial of the applicant's petition to amend the zoning regulations and incorporates all of that portion of the Memorandum of Decision to those reasons.
Rejection of re-zoning proposal reason 3.
While it is true that there does not currently exist a Design Housing Opportunity (DHO) district, that is all the more reason for adopting such a district rather than for rejecting such a proposal.
The court finds that all of the reasons for rejection of the re-zoning proposal, at best, are spurious.
D. REJECTION OF SITE DEVELOPMENT PLAN
The site development plan was denied based upon the findings of the Commission applicable to all of the applicant's petitions and applications. The court has already addressed the "adoption of findings of fact", the rejection of "zoning regulations text amendment", and the rejection of "re-zoning proposal", and incorporates all of that portion of the Memorandum of Decision by reference. The court finds that the rejection of the re-zoning proposal has no basis in fact and, at best, is spurious.
The court finds that the decision of the defendant Commission was arbitrary, illegal and an abuse of discretion. The court finds that none of the stated reasons for the Commission action are sufficient to support its decision.
Under the provisions of § 8-30g (c), the trial court is permitted to wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence and the record before it in the event the Commission does not satisfy its burden of proof.
 ORDER
The decision of the Commission is reversed and all of the approvals requested by the applicants are ordered granted with the following revisions and modifications:
1. The applicant is to comply with all of the "modifications and conditions" and "standard conditions" imposed by the Town of Monroe CT Page 8265 Conservation and Water Resources/Inland Wetland Commission on January 25, 2001.
2. The applicant is to comply with all of the Department of Environmental Protection State discharge permit requirements for engineering inspection through construction, and certification of the installed system to ensure that the constructed facilities conform with the approved plans and specifications.
3. The applicant is to provide all revisions to the site plan and all further soil testing as required by the Department of Environmental Protection.
4. The applicant is to comply with all requirements of the Department of Environmental Protection for any corrections to the system that may be required if the actual water usage exceeds the amount allowed by the Department of Environmental Protection.
5. The applicant is responsible for the Association retaining an engineer to monitor the overall system and its development.
6. To the extent that the Department of Environmental Protection will allow the applicant to make a gift of part or all of the Open Space to the Town of Monroe, the applicant is required to do so. Otherwise, the applicant is to provide the Town of Monroe with all easements that it proposed for Open Space purposes. In the event DEP requires that the land to be donated be in the ownership of the Association, then the applicant is to transfer ownership to the Association.
7. The defendant Commission is to approve of any reasonable bond requirements established by the Town of Monroe Water pollution Control Authority.
8. The applicant is to comply with all testing requirements of DEP, as well as any other requirements imposed by DEP regarding the construction documents or any other documents that DEP may require.
9. The applicant is to provide reasonable bonding requirements for blasting.
10. The court retains jurisdiction to resolve any disputes arising out of all of the paragraphs of this Order and its implementation.
11. At the public hearing held on December 7, 2000, the applicants proposed a larger conservation easement and a larger right of public access be extended. The court orders that the proposals made regarding CT Page 8266 the conservation easement and the right of public access be complied with by the applicants.
 ___________________, JTR AXELROD